TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
CAROLYN S. SMALL (Cal. Bar No. 304938)
Assistant United States Attorney
Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2041
     Facsimile: (213) 894-6269
     Email:     Carolyn.Small@usdoj.gov

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
JASON COVERT (Ind. Bar. No. 29268-53)
Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice
     1400 New York Ave. NW
     Washington, D.C. 20530
     Telephone: (202) 307-0659
     Email:     Jason.Covert@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA


Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 21-187-JFW |
| Plaintiff, | GOVERNMENT'S TRIAL BRIEF |
| v. | Trial Date:  March 22, 2022 |
| OUMAR SISSOKO, | Trial Time:  8:30 a.m.<br>Location:    Courtroom of the<br>             Hon. John F. Walter |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, Assistant United States Attorney Carolyn S. Small and Trial Attorney Jason Covert, hereby files its Trial Brief.

The government respectfully reserves the right to supplement its Trial Brief, if necessary, including by filing a supplemental memorandum regarding criminal forfeiture.[1]

Dated: March 15, 2022          Respectfully submitted,

TRACY L. WILKISON
United States Attorney

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section

SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division

    /s/
CAROLYN S. SMALL
Assistant United States Attorney

JASON COVERT
Trial Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

---

[1] Defense counsel has informed the government that if the jury finds defendant guilty of any of the charged offenses, defendant would request retention of the jury to decide forfeiture. The parties therefore anticipate that there may be a criminal forfeiture phase of the trial.

2

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES......................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES......................................1

I.   INTRODUCTION.........................................................1

II.  THE INDICTMENT.......................................................1

III. STATEMENT OF FACTS...................................................1

    A.   Defendant's Company, Road Doctor California LLC, Applies for and Receives a $7.25 Million PPP Loan.........1

    B.   Within Ten Days, Defendant Spends More than $370,000 of the PPP Funds on Unauthorized Expenses Before the Bank Freezes His Accounts................................3

    C.   Defendant's False Statements to a Chase Employee and to an Undercover FBI Agent During a Recorded Call in June 2020..............................................5

IV.  THE CHARGED OFFENSES.................................................6

V.   LEGAL AND EVIDENTIARY ISSUES.........................................8

    A.   Wire Fraud Based on a Theory of Fraudulent Misappropriation........................................8

    B.   Defendant's Statements During a Recorded Call with an Undercover FBI Agent..................................10

    C.   Business Records......................................11

    D.   Judicial Notice.......................................12

    E.   Summary Witness and Exhibits..........................12

    F.   Cross-Examination of Defendant........................13

    G.   Reciprocal Discovery and Affirmative Defenses.........14

VI.  FORFEITURE..........................................................14

VII. CONCLUSION..........................................................15

**TABLE OF AUTHORITIES**

Cases

Carpenter v. United States,
  484 U.S. 19 (1987) ............................................... 9

Pasquantino v. United States,
  544 U.S. 349 (2005) ............................................. 10

U-Haul Int'l v. Lumbermans Mutual Casualty Co.,
  576 F.3d 1040 (9th Cir. 2009) ................................... 12

United States v. Catabran,
  836 F.2d 453 (9th Cir. 1988) .................................... 11

United States v. Jones,
  472 F.3d 1136 (9th Cir. 2007) .................................... 9

United States v. Lindsey,
  850 F.3d 1009 (9th Cir. 2017) .................................... 7

Ohler v. United States,
  529 U.S. 753 (2000) ............................................. 13

United States v. Black,
  767 F.2d 1334 (9th Cir. 1985) ................................... 13

United States v. Cuozzo,
  962 F.2d 945 (9th Cir. 1992) .................................... 13

United States v. Garlick,
  240 F.3d 789 (9th Cir. 2001) ..................................... 8

United States v. Jinian,
  725 F.3d 954 (9th Cir. 2013) .................................. 7, 8

United States v. Lemire,
  720 F.2d 1327 (D.C. Cir. 1983) .................................. 13

United States v. Miranda-Uriarte,
  649 F.2d 1345 (9th Cir. 1981) ................................... 13

United States v. Ortega,
  203 F.3d 675 (9th Cir. 2000) ...................................... 11
United States v. Shirley,
  884 F.2d 1130 (9th Cir. 1989) ..................................... 12
United States v. Willis,
  759 F.2d 1486 (11th Cir. 1985) .................................... 11
United States v. Young,
  248 F.3d 260 (4th Cir. 2001) ...................................... 14

Rules

Fed. R. Evid. 902(11)................................................ 11
Fed. R. Evid. 801(d)(2).............................................. 11

Statutes

18 U.S.C. § 1343................................................... 1, 7

Other Authorities

Ninth Circuit Model Criminal Jury Instructions, No. 15.35 (Wire Fraud)............................................................... 7
Federal Jury Practice and Instructions § 47.15 (5th ed. 2000)....... 8

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

Jury trial is set for March 22, 2022, at 8:30 a.m.  The government estimates approximately two days for its case-in-chief, not including jury selection.  The government anticipates calling approximately eleven witnesses, as identified in the government's Pre-Trial Witness List.  Defendant is not in custody pending trial.

**II.  THE INDICTMENT**

On April 13, 2021, a grand jury returned a four-count Indictment charging defendant OUMAR SISSOKO ("defendant") with four counts of wire fraud, in violation of 18 U.S.C. § 1343.

**III. STATEMENT OF FACTS**

The evidence at trial will prove the following:

**A.   Defendant's Company, Road Doctor California LLC, Applies for and Receives a $7.25 Million PPP Loan**

On April 24, 2020, defendant submitted a Paycheck Protection Program ("PPP") loan application to JPMorgan Chase on behalf of the company Road Doctor California.  (Government's Exhibit ("GX") 8.)  To submit the loan application, Road Doctor completed a form through Chase's online portal and uploaded the following supporting documents: (1) a completed PDF of a PPP Borrower Application Form (the "Application Form") (GX 5); (2) a supplemental packet of information in which the applicant quoted portions of the PPP rules and regulations, including the SBA's PPP Interim Final Rule dated April 15, 2020, and provided a breakdown of anticipated business expenses (the "Supplemental Packet") (GX 6); and (3) various tax documents (certain of which are contained in GX 7).  Although the loan application purportedly was submitted by defendant's wife, the

metadata and document properties from the Supplemental Packet identify "Oumar Sissoko" as the author (GX 72, 73, and 74). Additionally, defendant was listed as the primary contact for Road Doctor on the Application Form, and provided the bank with his cell phone number and email address.

The Interim Final Rule dated April 15, 2020 (GX 11) explained how PPP loan proceeds could be used, and it advised: "If you knowingly use the funds for unauthorized purposes, you will be subject to additional liability [beyond repayment] such as charges for fraud." While these portions of the Interim Final Rule were not referenced in the Supplemental Packet submitted to JPMorgan Chase by defendant, other portions of the Rule were cited, demonstrating that defendant had read the Rule. Defendant also quoted in the Supplemental Packet portions of a document titled "Paycheck Protection Program Loans Frequently Asked Questions (FAQs)" (GX 12), which contained additional guidance from the SBA about the Paycheck Protection Program, demonstrating that he was aware of, and reading the SBA's guidance on the PPP.

According to the Supplemental Packet, Road Doctor was a pothole repair business that was in the process of hiring 450 employees. It calculated anticipated payroll expenses of $2.9 million, which purportedly would cover operations in five states (California, Arizona, Nevada, Oregon, and Washington). According to the breakdown defendant provided the bank, these payroll expenses consisted of monthly salaries, rent for multiple locations in California, cost of goods sold, administrative expenses, and insurance.

Both the digital application completed via Chase's online portal and the Application Form that defendant voluntarily submitted to the

2

bank contained various certifications. The third certification on the Application Form stated:

> The funds will be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule; I understand that if the funds are knowingly used for unauthorized purposes, the federal government may hold me legally liable, such as for charges of fraud.

The digital application completed via Chase's online portal contained a similar certification that the funds would "be used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments."

Although defendant did not qualify for a PPP loan based on his application, the bank mistakenly approved Road Doctor for a $7.25 million PPP loan. A promissory note was issued for the loan (GX 9), which required the borrower, Road Doctor California LLC, to again agree: "All loan proceeds will be used only for purposes permitted under the Paycheck Protection Program provided for in the CARES Act." Although defendant made specific representations to the bank regarding how the company would use the proceeds and further certified that the proceeds would only be used for authorized PPP expenses, once the defendant had access to Road Doctor California's PPP funds, he spent them contrary to his representations to the bank.

**B. Within Ten Days, Defendant Spends More than $370,000 of the PPP Funds on Unauthorized Expenses Before the Bank Freezes His Accounts**

On May 1, 2020, $7.25 million of PPP loan funds were disbursed into Road Doctor's checking account. There was a negative balance in the account before the PPP funds were disbursed. Over the course of the next ten days, defendant and his family spent hundreds of

3

thousands of dollars of PPP funds on various expenses --- none of which were payroll, mortgage interest, rent, or utilities.

One of defendant's biggest purchases was a new AMG E53 Mercedes-Benz on May 5, 2020, for $113,000. (GX 2, 13.) Defendant also spent $8,780 for optional services contracts for the Mercedes, $7,000 of which he put on a debit card that drew from the PPP funds in Road Doctor's checking account (Count 3). The Mercedes was registered personally in the name of defendant and his wife; it was not registered in the name of Road Doctor. (GX 13 at 66; GX 69.)

In addition to purchasing the Mercedes, defendant spent the PPP money on various other expenditures, which are summarized in Government's Exhibits 85 and 86. For example, he spent $35,000 to pay a lawyer in Canada; $100,000 to make a down payment on a factory in New Hampshire that he had been trying to acquire for years; and over $5,000 to purchase a computer from Apple.com (Count 4). Defendant also expended over $25,000 in transfers to his children and other individuals and making a cash withdrawal, and he spent nearly $5,000 at places like Costco, Nordstrom, Birkenstock, and GOAT (a sneaker seller). Additionally, $90,000 was transferred to defendant's wife personal account, and $20,000 from those proceeds were used to pay off a BMW that defendant had leased in 2016 (Count 1).

Defendant conceded in an audio recording that he and his wife were the only employees of Road Doctor as of June 23, 2020, which shows that defendant's children and the other individuals to whom defendant sent PPP money were not employees of Road Doctor, and the payments to them therefore were not for payroll. Additionally, a witness from California's Employment Development Department ("EDD") -

4

-- which administers California's payroll tax programs and collects taxes from employers --- will testify that defendant first filed a registration form for Road Doctor on or about December 28, 2020, but that the company never remitted payroll taxes or filed payroll returns for any employees.

On or about May 4, 2020, defendant attempted to initiate wire transfers to an entity he controlled in Mauritania called BOS Holdings Mauritania. Because the attempted wire transfers were above defendant's wire limit, a supervisor at Chase got involved to look into whether the wire limit could be increased. That supervisor will testimony that in the course of looking into this issue, she discovered that defendant's company had been granted a large PPP loan. She reviewed the loan application materials and realized immediately that the loan should not have been approved. She escalated the issue to her manager, and defendant's accounts were ultimately suspended. The remaining PPP funds in the amount of approximately $6.8 million were frozen and later clawed back by the bank and applied to the outstanding loan balance.

### C. Defendant's False Statements to a Chase Employee and to an Undercover FBI Agent During a Recorded Call in June 2020

On May 7, 2020, after defendant's attempted wire transfers to BOS Holdings Mauritania failed to go through, defendant emailed a Chase employee and attempted to persuade the employee to release his funds. (GX 33.) In the email, defendant falsely represented that BOS Holdings Mauritania had an agreement with John Deere to supply equipment for highway projects abroad. A custodian of records from Deere & Company has searched Deere & Company's records and determined the company has no records related to defendant or BOS Holdings at

5

all.  Furthermore, a former employee for a heavy machine dealer located in Riverside, will testify that he provided defendant a quote for a machine in 2017, after which defendant made no further contact.

Later, on June 23, 2020, when to defendant's knowledge the PPP funds were still frozen, an undercover FBI agent purporting to be a contractor with the bank (the "UC") placed a recorded call to defendant's wife, who, as noted above, was the signatory on the PPP loan application.  Immediately after the UC said she was calling from the bank, defendant took the call over from his wife and spoke to the UC for nearly an hour.  In response to questioning about how the PPP funds had been spent, defendant stated he had spent $100,000 to make a down payment on a factory and had spent $35,000 to hire a Canadian lawyer.  After being pressed further about his expenditures, defendant admitted he had purchased a Mercedes-Benz, which he characterized as a "corporate car," contrary to his statement to the Mercedes salesman that defendant was purchasing the car for his son. When asked about the wires to his subsidiary in Africa, defendant again falsely claimed to have an agreement with John Deere to provide all of the equipment for Road Doctor and his overseas mining operation. Although he was asked several times during the call whether he had made other expenditures with the PPP funds, defendant failed to disclose numerous inappropriate uses of the proceeds.

**IV.   THE CHARGED OFFENSES**

The elements of wire fraud, in violation of 18 U.S.C. § 1343, are as follows:

1.   The defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent

6

pretenses, representations, promises, or omitted facts. Deceitful statements of half-truths may constitute false or fraudulent representations;

    2.    The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

    3.    The defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

    4.    The defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

Ninth Circuit Model Criminal Jury Instructions, No. 15.35 (Wire Fraud).

    "[A] fraud victim's negligence is not a defense to criminal charges under the federal fraud statutes." United States v. Lindsey, 850 F.3d 1009, 1014-15 (9th Cir. 2017). This legal principle remains true even when the victim is an entity. Indeed, the Ninth Circuit has specifically held in the mortgage-fraud context that a lender's negligence in verifying loan application information, or even intentional disregard of the information, is not a defense to fraud. Id. at 1014; see also Ninth Circuit Model Criminal Jury Instructions, No. 15.35 (Wire Fraud) (note regarding cases involving mortgage fraud).

    The "interstate" requirement in 18 U.S.C. § 1343 is jurisdictional and not a substantive element of wire fraud. United States v. Jinian, 725 F.3d 954, 965 (9th Cir. 2013). The government therefore is not required to prove a defendant knew his actions had an "interstate nexus" to establish a violation of a statute requiring

7

an "interstate nexus." Id. Each transmission by wire in interstate commerce to advance, further, or carry out the scheme may be a separate wire fraud count. See United States v. Garlick, 240 F.3d 789, 792 (9th Cir. 2001) ("Insofar as we have never expressly held that each use of the wires constitutes a separate violation of 18 U.S.C. § 1343, we do so now."); see also 2A O'Malley, Grenig & Lee, Federal Jury Practice and Instructions § 47.15 (5th ed. 2000).

Here, the wire fraud counts are based on defendant's use of PPP loan proceeds for the following four expenditures:

(1) $20,000 to fund a cashier's check that was used to pay off a debt defendant owed on a BMW (Count 1);

(2) $111,000 to fund a cashier's check that was used to purchase a Mercedes-Benz (Count 2);

(3) A $7,000 debit transaction to purchase optional services contracts for the Mercedes-Benz that is the subject of Count 2 (Count 3); and

(4) A $5,876 debit transaction to purchase a 27" Apple iMac Pro computer (Count 4).

Each of these transactions involved the use of interstate wires.

**V.  LEGAL AND EVIDENTIARY ISSUES**

  **A.  Wire Fraud Based on a Theory of Fraudulent Misappropriation**

The government intends to prove at trial that defendant's fraudulent scheme consisted of misappropriating PPP funds by using those funds to make unauthorized purchases.

The Supreme Court and the Ninth Circuit have repeatedly adopted a "broad understanding of fraud" that includes not just the fraudulent taking of money or property from a victim, but also the "fraudulent appropriation" of money or property that a victim has

8

entrusted to a defendant. See, e.g., United States v. Jones, 472 F.3d 1136, 1140 (9th Cir. 2007) (emphasis added) (quotations omitted). Jones, for instance, rejected the defendant's contention that his conduct did not fall within the ambit of the wire-fraud statute because he did not make any false representations prior to receiving money from victims. Id. There, the defendant solicited money from investors to purchase luxury cars that purportedly were being sold at cut rate prices as part of an attempt to liquidate the estate of a wealthy car collector. Id. at 1137. The defendant told investors he would collect their money for safekeeping and would not turn over their funds to the estate until the cars were delivered. Id. at 1137. In reality, neither the cars nor the estate existed, though it was undisputed that the defendant did not know of the fraudulent nature of the investment at the time he first solicited the investments. Id. However, contrary to the defendant's representations that he would use the money to acquire the luxury cars from the estate, the defendant instead spent the money on himself. Id. The Ninth Circuit held that this conduct constituted wire fraud. Id. at 1140. In reaching that conclusion, the court explained that although the defendant "did not possess a fraudulent intent when he received the money, his fraudulent appropriation of the funds still satisfies the elements of § 1343." Id. The court also noted that the Supreme Court "has interpreted § 1343 broadly and twice held that individuals who retain or misappropriate the money or property of others, regardless of how they acquired it, fall within the purview of mail or wire fraud." Id. at 1139 (emphasis added); see also Carpenter v. United States, 484 U.S. 19, 27 (1987) ("The concept of 'fraud' includes the act of embezzlement, which is

9

fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another." (internal quotations omitted)); Pasquantino v. United States, 544 U.S. 349, 356 (2005) ("[F]raud at common law included a scheme to deprive a victim of his entitlement to money.").

Jones is squarely on point in this case. The government intends to prove that, contrary to defendant's representation to the bank that the PPP funds would be "used to retain workers and maintain payroll or make mortgage interest payments, lease payments, and utility payments, as specified under the Paycheck Protection Program Rule," defendant in fact used the money to purchase two luxury cars; send money to his children and individuals abroad; put a down payment on a factory in New Hampshire; buy items from Nordstrom, Costco, Birkenstock, GOAT (a sneaker seller), and Apple.com; and make various other unauthorized expenditures. This conduct falls within the purview of the wire-fraud statute, regardless of how defendant acquired the PPP funds in the first instance. See Jones, 472 F.3d at 1140. Moreover, the half-truths, misrepresentations, and omissions defendant made to a bank employee and the undercover agent, whom he believed worked for the bank, after he received and misappropriated the funds is evidence of his fraudulent intent and consciousness of guilt.

**B.   Defendant's Statements During a Recorded Call with an Undercover FBI Agent**

As set forth in Government's Motion In Limine #1 ("MIL #1") (Dkt. 72), the government intends to offer prior, audio-recorded statements made by defendant to an undercover law enforcement officer.  These statements, when offered by the government, are

admissible under Rule 801(d)(2) of the Federal Rules of Evidence because they are opposing-party statements.  Defendant may not, however, elicit his own prior statements from a witness (including himself), because they are hearsay when offered by him.  Fed. R. Evid. 801(d)(2); United States v. Ortega, 203 F.3d 675, 682 (9th Cir. 2000); United States v. Willis, 759 F.2d 1486, 1501 (11th Cir. 1985) (defendant's exculpatory statements inadmissible when offered by defense).  Nonetheless, defendant has informed the government that he intends to offer as evidence his own prior statements from the recording.  The government has sought to preclude defendant from introducing these hearsay statements in MIL #1.  That motion is currently pending before the Court.  A hearing on the motion is set for March 18, 2022, at 9:00 a.m.[1]

### C. Business Records

During trial, the government will seek to admit documents obtained from various institutions as self-authenticating business records pursuant to Federal Rule of Evidence 902(11).  The government has provided notice to defendant of which documents it intends to

Computer printouts that are compilations of data regularly maintained by a business, such as printouts from a bank's internal systems that the bank maintains in the ordinary course of its business, are admissible as records of regularly conducted activity pursuant to Fed. R. Evid. 803(6).  See United States v. Catabran, 836 F.2d 453, 458 (9th Cir. 1988) (questions as to accuracy "of business records, would have affected only the weight of the printouts, not their admissibility."); U-Haul Int'l v. Lumbermans Mutual Casualty

---

[1] No other motions in limine have been filed by either party.

11

1  Co., 576 F.3d 1040, 1043-44 (9th Cir. 2009) (computer records kept in
2  the regular course of business activity properly admitted under Fed.
3  R. Evid. 803(6)).

   D.  **Judicial Notice**

   The government intends to request that the Court take judicial notice of the SBA's April 15, 2020, PPP Interim Final Rule (GX 11). See 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed...."); Mora v. Vasquez (In re Mora), 199 F.3d 1024, 1028 n. 7 (9th Cir.1999) (judicially noticing postal regulations that were incorporated into the Code of Federal Regulations). The April 15, 2020, PPP Interim Final Rule, which was published in the Federal Register at 85 F.R. 20811, applied to applications submitted under the Paycheck Protection Program through June 30, 2020, or until funds made available for that purpose were exhausted. The parties have submitted a proposed stipulated jury instruction on this issue (Stipulated Jury Instruction 3).

   E.  **Summary Witness and Exhibits**

   This case involves a large number of financial records.  To assist in the jury's understanding of the case, the government has prepared charts and summaries of those materials under Federal Rule of Evidence 1006.  Those exhibits are marked as GX 75-86.  The government intends to have a summary witness, Special Agent Erin Bourassa of the Federal Deposit Insurance Corporation Office of Inspector General, testify about, and use these charts to summarize admissible evidence.

   The Court and jury are entitled to have a witness "organize and evaluate evidence [that] is factually complex and fragmentally revealed[.]"  United States v. Shirley, 884 F.2d 1130, 1133 (9th Cir.

1989) (DEA agent's testimony regarding her review of various telephone records, rental receipts, and other previously offered testimony held to be proper summary evidence, as it helped jury organize and evaluate evidence; summary charts properly admitted); United States v. Lemire, 720 F.2d 1327, 1348 (D.C. Cir. 1983) ("[J]ust as an expert can assist a jury by imparting special knowledge that helps the jury to understand technical evidence, a non-expert summary witness can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of a multitude of witnesses throughout the trial.").

### F.  Cross-Examination of Defendant

The government does not know whether defendant intends to testify at trial.  If defendant does testify, he waives his right against self-incrimination and subjects himself to cross-examination concerning all matters reasonably related to the subject matter of his testimony.  See, e.g., Ohler v. United States, 529 U.S. 753, 759 (2000) ("It has long been held that a defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination" (internal citation and quotation marks omitted)).  A defendant has no right to avoid cross-examination on matters that call into question his claim of innocence.  United States v. Miranda-Uriarte, 649 F.2d 1345, 1353-54 (9th Cir. 1981). The scope of a defendant's waiver is co-extensive with the scope of relevant cross-examination.  United States v. Cuozzo, 962 F.2d 945, 948 (9th Cir. 1992); United States v. Black, 767 F.2d 1334, 1341 (9th Cir. 1985) ("What the defendant actually discusses on direct does not determine the extent of permissible cross-examination or his waiver.

Rather, the inquiry is whether 'the government's questions are reasonably related' to the subjects covered by the defendant's testimony.").

### G. Reciprocal Discovery and Affirmative Defenses

As of the date of this filing, defendant has not produced to the government any reciprocal discovery to which the government may be entitled under Rules 16(b) and 26.2 of the Federal Rules of Criminal Procedure.[2] Further, defendant has not provided the government with notice of any affirmative defenses. To the extent defendant attempts to introduce or use any documents at trial that he has not produced, or seeks to rely on an undisclosed affirmative defense, the government reserves the right to object and to request that the Court exclude defendant's undisclosed documents or affirmative defense. See United States v. Young, 248 F.3d 260, 269-70 (4th Cir. 2001) (upholding exclusion under Rule 16 of audiotape evidence defendant did not produce in pretrial discovery where defendant sought to introduce audiotape on cross-examination of government witness not for impeachment purposes but as substantive "evidence in chief" that someone else committed the crime).

## VI. FORFEITURE

Defense counsel has informed the government that if the jury finds defendant guilty of any of the charged offenses, defendant intends to request retention of the jury to decide forfeiture. The parties therefore anticipate there may be a criminal forfeiture phase of the trial immediately following the guilt phase of the trial. A

---

[2] Defendant has provided notice that he intends to call Bella Wang as an expert who will testify regarding PPP loans and has provided some background information about Ms. Wang.

14

supplemental trial memorandum regarding criminal forfeiture is filed concurrently herewith.

**VII. CONCLUSION**

The government requests leave to supplement this trial memorandum as may become appropriate during the course of trial.